Marshall, C. J.,
dissenting. The judgment of this court in this cause, concurred in by a bare majority of the court, is so inequitable, and so far discriminates against private charities, and operates so great an injustice to those who are charitably disposed, and the conclusions reached are so violative of the well-settled rules of statutory construction, that I feel called upon to register a protest, with a view of preventing the principles declared in the majority opinion from becoming the settled law of this state. While the facts of this controversy are very meagerly stated in the majority opinion, enough will be found therein for an understanding of ■ the principles discussed; It will of course be presumed that the conclusions reached in the majority opinion are based upon the facts stated in *450 that opinion, and I desire therefore to call attention to one or two facts therein stated which are not exactly in accordance with the true situation. It is true that the petition in mandamus does allege that “the facilities for housing pupils of the Worthington schools are now over-taxed, and whereas it is impossible to obtain sufficient funds for hiring additional teachers and pay the expenses incident to such enlargement of the schools,” etc. It must be borne in mind, however, that at this same, term of this court another cause was argued (104 Ohio St., 317) in which it was sought by the pros¿euting attorney of Franklin county to compel the school districts from whence the children of the Methodist Home originally came to pay their proportionate share of the cost of maintaining the Worthington schools. That relief was granted, and that portion of the petition pertaining to the cost of maintenance of schools can no longer have any application. That portion of the above-quoted allegation from the petition, relating to the enlargement of school facilities, is still an element in the case, but it is impossible that that can have any controlling importance in the case, because by the provisions of Section 7681, General Code, the same difficulty would arise in any school district where a public children’s home is located.
The majority opinion also seeks to capitalize the fact that the Methodist Children’s Home is authorized by its charter to train the children, “physically, mentally and spiritually.” The fact that that corporation has taken the precaution to obtain the necessary authority to do such things should not be held to relieve the state of Ohio from diseharg *451 ing the duty enjoined upon the people hy the state Constitution, the Ordinance of 1787, and the statutes of Ohio, to educate the youths of school age within the state of Ohio.
The question for determination in this case is whether the board of education of the Worthington village school district can be compelled to admit to the public schools of the district the inmates of school age of the Methodist Children’s Home Association of Worthington, for the year beginning September, 1921. The determination of this question depends not alone upon the true meaning and application of Section 7681, General Code, and the proper construction to be given to that portion of the section which reads “The board of education may admit the inmates of a private children’s home or orphan asylum located in the district, with -or without the payment of tuition fees, as may be agreed upon,” but also upon the true meaning of several other sections of the school code.
It is contended on the one hand that by reason of the employment of the word “may” the duty is at most discretionary, and that the discretion rests in the board of education of the school district. It is on the other hand contended by the Home Association that the word “may” should be construed as “shall,” thereby making the word mandatory.
It is not doubted that under certain conditions and within certain limitations the word “may” is properly construed as “shall” and therefore an ambiguity is at once presented for determination, and therefore a proper case for statutory construction. It is the proper province of statutory construction *452 to determine the sense, real meaning, or proper explanation of obscure and ambiguous terms and the application of the same to the case in question. In determining such meaning, the primary rule is .to ascertain the legislative intent, and such intent may properly be determined by recourse to other secondary rules of construction.
It should be stated at the outset that it is conceded by counsel for the board of education that Section 7681, General Code, is constitutional, and it is also conceded by counsel for the Home Association that if the construction making the duty to admit the children a mandatory one is held to be the proper construction the statute is constitutional. In the view I have taken of this entire controversy, it will be assumed that the statute is constitutional.
We will first compare the language above quoted with other provisions found in the same section. It will be found that whatever agreement may be made relating to the payment of tuition will not be material to the Home Association, because in any event any compensation to be paid will not be paid by the home, but, on the contrary, ample provision is made in the latter provisions of the section for any such payment to be collected from the boards of education in those districts from which the children originated. It therefore creates the rather absurd situation of the trustees of the home making a contract for the payment of tuition in which the obligation will be created against a third party. On the theory that the legislature will not be held to have intended to create an absurd situation, it would seem to be a more sound theory that the legislature intended that the inmates of the home should at all *453 events be admitted to the schools and that it should be optional with the board of education as to whether they would be educated without charge or whether the payment of tuition would be required.
It will be further found that nowhere else in the statutes is provision made for the inmates of county, semi-public and district children’s homes being educated in the public schools of the districts in which such public homes may be located. Inasmuch as public homes and private homes are mentioned in the same section of the statutes, and not • elsewhere, it would hardly be presumed that the legislature intended that inmates of public homes maintained by public taxation should have the benefit of an education, but that the legislature was indifferent upon the subject of the education of children being maintained in homes supported by private bounty. True, it might properly be inquired why the statute did not mention all homes, without distinction between public and private, if it was intended that all should be treated alike, but the answer may be found in the difficulty usually presented in attaching an amendment to an existing statute, and the courts may not be required to answer the very difficult question as to why the legislature has not used more apt language. If it should be contended that the legislature did intend to discriminate between the inmates of public homes and the inmates of private homes, the legislature would probably be exceeding its power, because of the limitations of Section 26, Article II of the Ohio Constitution, which provides that all laws of a general nature shall have a uniform operation throughout the state. It would seem more reasonable to discriminate in *454 favor of the private charity, if for no other reason than to encourage private benefactions. The apostle Paul, in his epistle to the Corinthians, said: “And now abideth faith, hope, charity, these three; but the greatest of these is charity” (I Corinthians 13:13). Upon no principle of sound sense, logic, or legislation, can it be assumed that the legislature intended that the inmates of private children’s homes should not be educated at all. The state of Ohio is a part of the old Northwest Territory and the ordinance of the Confederate Congress, passed July 13, 1787, known as the Ordinance of 1787, providing for the government of that territory and for its division into states to be admitted into the Union, in Article III thereof, enacted: “Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.”
This provision was Just as obligatory upon the future policies and future governments of the territory as was that provision of Article VI thereof, which provided that: “There shall be neither slavery nor involuntary servitude in the said territory, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted.” The obligations of that ordinance were fully recognized by the framers of the original constitution of 1802, and it was said in the preamble to that constitution, in part: “We, the people of the eastern division of the territory of the United States, northwest of the river Ohio, having the right of admission into the general government, as a member of the Union, consistent with the Constitution of the United States, the ordinance of Congress of one thousand seven hundred *455 and eighty-seven, and of the law of Congress, entitled ‘An act to enable the people of the eastern division of the territory of the United States, northwest of the river Ohio, to form a constitution and state government, and for the admission of such state into the Union, on an equal footing with the origimal states, and for other purposes* * * do ordain and establish the following constitution or form of government; * * *”
The Constitution of the state of Ohio, as it exists at the present time in Sections 1, 2 and 3, Article VI, contains provisions which fully commit the legislature of the state of Ohio to the obligation to make such provision, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state, and requiring provision to be made by law for the organization, administration and control of the public schools system of the state. The equal benefit of public funds applicable to school purposes cannot be conferred upon all of the children of school age throughout the state if children of school age in private children’s homes may be denied admission to the common schools where such homes are located. The foregoing observations are not made to reflect upon the constitutionality of Section 7681, but to show that a construction of that statute should give meaning to the language employed which will be in harmony with the constitutional provision referred to.
For the purpose of showing the general legislative intent concerning the school attendance of children of school age, we quote the following from the recent statutory amendments above referred to:
*456 “Sec. 7762. All parents, guardians or other persons who have the care of children who are of compulsory school age as indicated in Section 7763, General Code, * * * shall instruct them or cause them to be instructed, in * * * those branches or in such other branches as are suited to the age, employment and advancement of the particular children and are included in the subjects taught in the schools of the state.”
‘ ‘ See. 7763. Every parent, guardian or other person having charge of any child of compulsory school age * * * must send such child to a public, private or parochial school for the full time the school attended is in session, which shall in no case be for less than thirty-two weeks per school year * * * Compulsory school age shall mean six to eighteen years of age * *
“Sec. 7770. * * * The attendance officer or assistant may also take into custody any youth of compulsory school age not legally employed on an age and schooling certificate who is not attending school and shall conduct such youth to the school he has been attending or should rightfully attend.”
“Sec. 7773. * * * When any child of compulsory school age, in violation of the provisions of this chapter, is not attending school, the attendance officer shall notify the parent, guardian or other person in charge of such child of the fact, and require such parent, guardian or other person to cause the child to attend school forthwith; and it shall be the duty of the parent, guardian or other person in charge of the child so to cause its attendance at school. Upon the failure of the parent, guardian or other person in charge of the child to do so, the attendance officer *457 shall make complaint against the parent, guardian or other person in charge of the child in any court of competent jurisdiction.”
“Sec. 7778. Every child actually resident in the state shall be amenable to the laws relating to compulsory education, and neither he nor the person in charge of Mm shall be excused from the operation of said laws or the penalties under them on the ground that the child’s residence is seasonal or that the parent of the child is a resident of another state or that the child has attended school for the legal period in another state. The board of education in a/ny school district shall admit without tuition charge any child actually resident in the district who would otherwise be deprived of school privileges in this state.'"'
All the statutes above quoted from are in pari materia with the sections under construction, and if it is the duty of persons having care and charge of children to send them to the public schools of the district in which such child is found, and is the duty of the attendance officer to conduct them to the school, it follows that it is the duty of the school board to admit such children. The foregoing statutes are at least useful in indicating the general legislative policy of the state of Ohio in the matter of education of youths of school age. It is a governmental maxim, oft quoted, that schoolhouses and schoolmasters are forts and garrisons of any republic. The maxim does not refer to an empty schoolhouse, nor to a teacher without pupils. As further reflecting upon the essential policy of the state, it must be recognized that an educated citizenship is the hope and mainstay of any republic, “dovern *458 meni of the people, for the people, and by the people,” is neither practical nor possible unless aided and fostered by education. It is a generally accepted truth that anarchy and bolshevism have their Source and growth in ignorance, and the ever-present menace of those dangerous doctrines calls for eternal vigilance on the part of those responsible for the public school system. These views are given emphatic encouragement in the statistics of illiteracy published in the 1920 census, which show that in the United States six per cent, of all persons over ten years of age are wholly illiterate, and for the state of Ohio two and eight-tenths per cent. While the Ohio percentage is small as compared with the average of all the states, it looks large by comparison with that of the state of Iowa, in which state it is only one and one-tenth per cent. The state of Ohio with all its governmental subdivisions is spending ninety millions of dollars annually upon its public schools, and it must not be presumed that the legislature intended that any part of the orphan children of school age in the state of Ohio should be denied their equal participation in the benefits of that expenditure.
This entire question is easily disposed of if it can properly be determined that the word “may” was used in a mandatory sense. It is well settled that it may be thus construed in a proper case, and it is proper therefore to inquire in what class of cases it is to be so construed. As a general proposition, the rule applies to a statute which imposes a duty or confers a power on a public officer for public purposes. The statute relating to the probate of wills was given this interpretation in the case of Lessee *459 of Swazey’s Heirs v. Blackman, 8 Ohio, 5, at page 18, from which we quote: “It declares that the executor, etc., may cause the will to be brought before the court of common pleas; and ‘may’ means ‘must,’ in all those cases where the public are interested, or where a matter of public policy, and not merely of private right, is involved.”
The same meaning was given to the word “may,” as found in the statute of limitations, in the ease of C., S. & C. Rd. Co. v. Mowatt, 35 Ohio St., 284, at page 287, from which we quote: “Where authority is conferred to perform an act which the public interest demands, may is generally regarded as imperative. Whether it is to be so read in another case depends upon a fair construction of the statute.”
From 2 Sutherland on Statutory Construction (Lewis, 2 ed.), Section 634, we quote: “But there may be something in the nature of the thing empowered to be done, something in the object for which it is to be done, something in the conditions under which it is to be done, something in the title of the person or persons for whose benefit the power is to be exercised, which may couple the power with a duty, and make it the duty of the person in whom the power is reposed to exercise that power when called on to do so.” Every syllable of the words just quoted is applicable and cogent.
Our attention has been very forcibly called to the case of State, ex rel. Mitman, v. Board of County Commrs. of Greene Co., 94 Ohio St., 296, in which there was a discussion of the force and effect to be given to an amendment to a statute in which the amendment substitutes the word “shall” for the word “may.” Upon the question actually decided *460 in that case, and upon the peculiar nature of the statute then under construction, no fault can be found with the conclusions there reached. The case here under consideration presents a different question. It is true that in the amendment of Section 7681 the word “may” was substituted for the word “shall,” and if that had been the only change made by the amendment, we would without hesitation say that it was intended to make the statute permissive instead of mandatory as it previously existed. We should, however, look to all of the changes made by the amendment and ascertain the evils if any to be repressed and the remedy to be advanced. Courts in construing a statute thus amended should not seek to merely make the statute operate differently, but rather to make it remedy the evil which before existed. A study of the entire section before and after amendment discloses that before amendment it required that the tuition of children in private children’s homes should be. paid by the county commissioners of the county in which the home is located. After amendment, the tuition was required to be paid by the boards of education in counties of the children’s last residence. In any large private children’s home, where children from other counties are being cared for, it is an injustice to visit the expense upon the county where the home is located, and it is more just and equitable that this expense should be visited upon the counties from which the children originated, and this was ■ undoubtedly the principal purpose the legislature had in mind in amending the statute. That case does not therefore authoritatively outweigh the other rules of construction herein discussed.
*461 By virtue of the well-settled, well-recognized governmental policy relating to the subject of education prevailing in the state of Ohio, as disclosed by the Ordinance of 1787, the Constitution of the state, of Ohio, and the numerous statutes relating to compulsory education, and by reason of the recognized necessity for educated citizenship, as a condition to the stability of the republic, and by reason of the established fact, as shown by the 1920 census, that one hundred and thirty-four years after the adoption of the federal constitution there yet remains an inexcusable percentage of illitéracy, and recognizing that the statute under construction must either afford or deny to a large number of orphan children of the state of Ohio the means and the opportunity to obtain an elementary education, the conclusion must be reached that there is something in the nature of the thing empowered to be done and in the object for which it is to be done, and something in the conditions under which it is to be done, and something in the title of the persons for whose benefit the power is to be exercised, which couples the power with the duty and therefore brings the entire question clearly within the rule requiring the word “may” to be construed in the imperative sense rather than the permissive.
The majority opinion is based almost exclusively upon an alleged interpretation of Section 7681, General Code, and almost entirely ignores all other sections of the code which have hereinbefore been referred to and quoted, and a careful examination of the majority opinion discloses that reference is made only to Section 7763, General Code. Section* 7763 is less important than any of the other sections which *462 have been herein referred to, and I cannot help feeling inclined to the opinion tha.t if those other sections had been carefully considered by the majority of this court a different conclusion must have been reached. Surely all those sections are in pari materia, and all those sections taken in conjunction with Section 7681 should create a clear legal duty on the part of the board of education of the Worthington district to educate all youths of school age whose home is within the territory comprised within the Worthington school district. The majority opinion turns entirely upon the proposition that the word “may” as employed in Section 7681 is intended in a permissive sense. While the writ of mandamus should be awarded in this ease, and while the strongest reason for so deciding may be found in construing Section 7681 in conjunction with other sections hereinbefore referred to, there is another equally strong basis for allowing the writ in a construction of Section 7681, General Code, standing alone. The portion of Section 7681, General Code, which is the bone of contention in this case is as follows: “The board of education may admit the inmates of a private children’s home or orphan asylum located in the district, with or without the payment of tuition fees, as may be agreed upon.” Keeping in mind that the word “may” is being construed as being employed in a permissive sense, and keeping in mind all of the other sections of the code herein-before quoted, and which must be held to be m pari materia with Section 7681, and observing the well-settled rule of construction that all those statutes must, if possible, be given full force and effect, and *463 also keeping in mind that the language above quoted is amendatory of a la.w theretofore existing, and endeavoring to ascertain what was the legislative intent and what was the legislative purpose intended to be served by making the amendment, what is the true construction of the language above quoted?
The old statute before amendment made it obligatory upon the school board to admit the inmates of a private children’s home and upon the county commissioners to pay the tuition. The amendment of 1917 omits the provision that the county commissioners shall pay the tuition and makes provision for collection of tuition from the school districts where the children formerly resided. A careful survey and comparison of the statute as it formerly existed with its language after the amendment, at the same time endeavoring to harmonize the amended section with other sections of the code hereinbefore quoted, indicates that it was the legislative intent to relieve the county commissioners of the county wherein the private school is located from the entire expense of educating such children and to make the more just and equitable provision of charging the expense of such tuition to the school districts where the children had their legal residence. It was not necessary in making the amendment to enjoin the duty upon the board of education of the district in which the school is located to admit the pupils, because that duty is already enjoined by the other sections of the code hereinbefore quoted. It is therefore more reasonable to suppose that Section 7681 was not intended to have any relation to the duty of admitting pupils, but rather was only intended to give the board of *464 education the option of educating them without charge or requiring the payment of tuition.
In other words, the matter of admission is covered by other sections of the statute, and the optional thing to which the word “may” in Section 7681 applies is the matter of tuition fees only. If it should be held that it was optional with the board of education as to whether or not it should admit the pupils, then the words “with or without the payment of tuition fees” would become entirely meaningless. If the board of education might exercise a discretion in the matter of admission, it would necessarily follow that the board could admit the pupils upon such terms as might be agreed upon. The legislature having expressly stated that the tuition fees might be the matter of agreement precludes the idea of anything else being left open to agreement. I have thérefore reached the conclusion that by the provisions of other sections of the code, taken in conjunction with Section 7681, General Code, the duty to admit the pupils is mandatory, and that by the provisions of the language of Section 7681, above quoted, the matter of tuition fees is optional.
This decision is destined to produce some unfortunate results. The possibility that it might result in the children of private orphans’ homes being reared in illiteracy is not to be thought of, because it would be a freak species of philanthropy which would provide food, clothing and shelter for orphan children and neglect their education. It is, however, likely to result in the dissolution of some private charities, or a diminution of the number of the children cared for.
*465 In the case at bar if it results in the maintenance of a private school within the home it will be even more unfortunate. The schools of the Worthington district can be better graded by the addition of the eighty-four pupils of the home, and it must be admitted that the children of the home will be benefited by concourse with the more fortunate children of the families of the Worthington district. The outstanding evil of this decision is that it causes segregation of the orphan children, thereby emphasizing and making them conscious of their misfortunes without any compensating benefits. Again, it will discourage philanthropy at a time when the world stands in greatest need of it. The key to judicial interpretation is the legislative intent, and surely it may not reasonably be presumed that the legislature intended such absurd and damaging results.